J-S13036-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| TERRY JERMAINE GARDNER | : | |
| | : | |
| Appellant | : | No. 2000 EDA 2022 |

Appeal from the PCRA Order Entered June 23, 2022
In the Court of Common Pleas of Chester County Criminal Division at
No(s): CP-15-CR-0003279-2006

BEFORE:   NICHOLS, J., MURRAY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:                    **FILED JUNE 12, 2023**

Appellant Terry Jermaine Gardner appeals the order of the Court of Common Pleas of Chester County denying his third petition pursuant to the Post-Conviction Relief Act (PCRA) as untimely filed.[1] We affirm.

This petition involves Appellant's underlying charges in connection with the shooting death of Brian Keith Brown on April 1, 2006. This Court summarized the factual background of this case as follows:

> In the early morning hours of April 1, 2006, a man by the name of Odell Cannon, received a call from Jonathan Thompson, who informed Mr. Cannon that Mr. Cannon's brother, Jonas Suber, had been shot. A blue vehicle driven by Dante Carter had pulled up next to Jonas Suber's white Cadillac and the passenger, Duron Peoples, had shot one or two shots through the window of the Cadillac, shattering the driver's side window, and hitting Mr. Suber in the right hand while he was speaking on a cell phone being held in that hand. The shooting was not random: Jonas Suber and

_____

[*] Former Justice specially assigned to the Superior Court.
[1] 42 Pa.C.S.A. §§ 9541-9546.

Duron Peoples were known enemies, their hatred stemming from the love of the same woman.

Mr. Cannon, upon hearing that his brother was shot, contacted his cousins, Randy Suber and Richard Legree, Jr., to pick him up and take him to his brother's house. On their way to Jonas Suber's house, Randy Suber was let out of the car and told by Mr. Cannon to go to the Elks Club to keep an eye on Brian Keith Brown, a friend of Duron Peoples. Upon arriving at Jonas Suber's house, Mr. Cannon and Mr. Legree met with a group of young men, including [Appellant], the injured Mr. Suber, Jonathan Thompson, Marquise James, Rahlik Gore, Josh McMillan, and Edgar Barber. The discussion among the individuals quickly turned to business. The group decided that Mr. Suber would be taken to the hospital by Marquise James to have his injury tended to. In the meantime, [Appellant] and the remaining individuals plotted retaliation against Duron Peoples. It was decided that if Mr. Peoples could not be found, then his friend, Brian Keith Brown, would become the target of the retaliation plan.

After devising the plan, the men dispersed and took their places throughout the neighborhood in the vicinity of where Mr. Brown had already been located via a conversation with Randy Suber. Following the initial meeting, Mr. Gore, Mr. Cannon, and [Appellant] met at Mr. Gore's house on Chestnut Street. There, [Appellant] agreed to shoot Mr. Brown on behalf of Mr. Cannon. Mr. Cannon promised that he would take care of [Appellant] if [Appellant] completed the shooting. Following the discussion with Mr. Cannon, [Appellant] took off in the direction of Eighth Street, equipped with a handgun. Mr. Gore and Mr. Cannon went off together to Mr. Cannon's aunt's house, in the area of Seventh Street and Chestnut Street to maintain updates regarding Mr. Brown's movements from Randy Suber.

When the Elks Club started to close for the night at 3 a.m., Randy Suber contacted Mr. Cannon and informed him that Mr. Brown was leaving the Elks Club. As Mr. Brown left, he was joined by a man named Steven Pittman. The two proceeded down Merchant Street toward North Chester Avenue. Meanwhile, [Appellant] emerged through an empty lot located on the south side of Merchant Street and approached Mr. Brown and Mr. Pittman in from of Wright's Funeral Home. [Appellant] then pulled out a gun and fatally wounded Mr. Brown.

Nearby, Robert Hamrick, who had just left the Vets Club, sat in his white van parked on Merchant Street, directly in front of Wright's Funeral Home. From his vehicle, Mr. Hamrick saw [Appellant] approach the victim, raise arm and fire. Panicked, he drove his van away from the scene and proceeded toward Eighth Avenue. Mr. Hamrick turned down Eighth Avenue and after parking and exiting his car, heard the voice of Edgar Barber call out to him. Mr. Barber asked him what had happened, and Mr. Hamrick explained that he had just seen [Appellant] shoot Mr. Brown. Mr. Barber invited Mr. Hamrick up to his porch where they discussed the shooting event.

Shortly thereafter, Mr. Gore and Mr. Cannon approached the porch of Mr. Barber. Prompted by Mr. Barber, Mr. Hamrick relayed to the men that he had witnessed the murder of Mr. Brown. As police vehicles began to swarm the area, the four men laid on the porch to avoid detection. As they lay there, Mr. Cannon received a direct-connect call from Mr. McMillan. During the conversation, Mr. Cannon was assured that [Appellant] was with Mr. McMillan, and there was discussion as to what had become of the gun used to show Mr. Brown. Mr. Cannon ended the conversation, advising Mr. McMillan and [Appellant] to "stay low" and "be cool." After the conversation with Mr. McMillan, Mr. Cannon warned Mr. Hamrick not to say anything about the murder of Mr. Brown.

At approximately 3:30 a.m. on that same morning of April 1, 2006, Rachel Pinder was awoken in her apartment by her then-fiancé, Mr. McMillan. As she roused herself from bed, Rahlik Gore and [Appellant] entered her home. [Appellant] had a black gun in his hands as he entered Ms. Pinder's residence. When Ms. Pinder inquired as to what was going on, [Appellant] told her that he had shot Mr. Brown. Concerned, she inquired as to whether Mr. Brown was on his way to the hospital in response to which, [Appellant] answered that Mr. Brown was dead and that he had certain of this to ensure that Mr. Brown wouldn't seek revenge on him.

On the day following the murder, April 2, 2006, [Appellant] asked Mr. Gore for a ride to Mr. Cannon's barber shop, stating that he needed to pick up money from Mr. Cannon. At some later point, Mr. Cannon called Mr. Gore and told him to buy some new clothes and sneakers for [Appellant]. Mr. Gore, in turn, called Mr. McMillan and made the same request of him. [Appellant] was provided a new pair of white, Nike Air Force One sneakers and a white sweat suit.

Later that same day, Mr. Legree happened to encounter [Appellant] walking down the road and offered to give him a ride. [Appellant] was wearing a white track suit and white sneakers. While they were driving, [Appellant] turned to Mr. Legree and asked him "how'd you like my work," referring to the shooting of Brian Keith Brown.

PCRA court order, 5/18/22, at 4-5 (citations omitted).

On August 20, 2010, after a jury trial, Appellant was convicted of first-degree murder, aggravated assault, criminal conspiracy to commit murder and aggravated assault, possession of a firearm without a license, and persons not to possess a firearm. On October 27, 2010, the trial court sentenced Appellant to an aggregate sentence of life imprisonment without parole. On October 26, 2011, this Court affirmed the judgment of sentence. *Commonwealth v. Gardner*, 3214 EDA 2010, at *1-2 (Pa.Super. October 26, 2011) (unpublished memorandum). On October 24, 2012, the Supreme Court denied Appellant's petition for allowance of appeal. *Commonwealth v. Gardner*, 55 A.3d 522 (Pa. 2012).

On July 8, 2013, Appellant filed his first *pro se* PCRA petition. The PCRA court appointed counsel, who subsequently filed a petition to withdraw and a no-merit letter pursuant to *Commonwealth v. Turner*, 544 A.2d 917 (Pa. 1988) and *Commonwealth v. Finley*, 550 A.2d 213 (Pa.Super. 1988). On December 29, 2014, the PCRA court issued notice of its intent to dismiss Appellant's petition without a hearing pursuant to Pa.R.Crim.P. 907. On February 9, 2015, the PCRA court dismissed the petition and permitted counsel to withdraw.

Once Appellant filed a timely appeal, the PCRA court directed him to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Despite being granted a 45-day extension to file a concise statement, Appellant filed an untimely Rule 1925(b) statement. On October 5, 2016, this Court dismissed the appeal based on Appellant's failure to file a timely court-ordered Rule 1925(b) statement. *Commonwealth v. Gardner*, 759 EDA 2015 (Pa.Super. October 5, 2016) (unpublished memorandum).

On April 23, 2018, Appellant filed a second PCRA petition. On June 22, 2018, the PCRA court issued a Rule 907 notice, specifically noting that Appellant's petition was untimely filed and did not meet one of the timeliness exceptions. Appellant did not respond to the Rule 907 notice. On July 24, 2018, the PCRA court dismissed the petition as untimely. While Appellant filed a timely appeal, this Court dismissed Appellant's appeal of his second PCRA petition as Appellant failed to file a brief. *Commonwealth v. Gardner*, 2462 EDA 2018 (Pa.Super. February 5, 2019).

On June 2, 2020, Appellant filed his third PCRA petition that is at issue in this appeal. On July 24, 2020, Appellant filed a Motion for Leave to File an Amended PCRA petition, which the trial court granted. On January 13, 2022, Appellant filed an amended petition that did not raise new claims but included a correction to one of the issues he raised in his June 2, 2020 petition.

On May 18, 2022, the PCRA court issued a Rule 907 notice, explaining that a hearing was unnecessary as Appellant's petition was untimely filed. Appellant did not respond to the Rule 907 notice. On June 23, 2022, the PCRA

- 5 -

court issued a final order denying Appellant's third PCRA petition. On August 9, 2022, Appellant filed a notice of appeal.

Appellant raises the following issues for our review on appeal (verbatim):

1. Whether the PCRA court abused its discretion and committed reversible error when determining that Appellant's claim that: Appellant's newly discovered evidence which contains the after-discovered evidence provision unavailability at the time of trial of exculpatory evidence has subsequently become available, affidavits of Odell Cannon, Randy Suber, Steve Pugh, and George Dalie?

2. Whether the PCRA court abused its discretion and committed reversible error when determining that Appellant's claim that: the Commonwealth withheld exculpatory evidence of Edgar Barber statements and testimony that key Commonwealth witnesses were lying about their whereabouts on the night of Brown homicide which falls within government inference, thus violating *Brady*?

3. Whether the PCRA court abused its discretion and committed reversible error when determining that Appellant's claim that: the Commonwealth's failure to disclose to [Appellant] at the time of trial favorable exculpatory material evidence of Edgar Barber statements and testimony that Rahlik Gore and Robert Hamrick lied about being on Mr. Barber's porch the night of Brown homicide amount to a classic prosecutorial misconduct violation?

4. Whether the PCRA court abused its discretion and committed reversible error when determining that Appellant's claim that: Appellant's conviction was [not] so unfair no civilized society can tolerate and [Appellant's] conviction was [not] based on a logical impossibility which amount to a miscarriage of justice?

5. Whether the PCRA court abused its discretion and committed reversible error when determining that Appellant's claim that: Appellant is serving an illegal sentence [as the] trial court judge sentenced Appellant separate on charges that should have merged?

Appellant's Brief, at 4-6.

As an initial matter, we must determine whether we have jurisdiction to address Appellant's facially untimely appeal. ***Commonwealth v. DiClaudio***, 112 A.3d 1242, 1244 (Pa.Super. 2019) (recognizing that this Court may raise jurisdictional issues *sua sponte*) (citation omitted). Our rules of procedure provide that an appeal "shall be filed within 30 days after the entry of the order from which the appeal is taken." Pa.R.A.P. 903(a).

As Appellant is currently incarcerated, we must apply the prisoner mailbox rule which provides that "a pro se prisoner's document is deemed filed on the date he delivers it to prison authorities for mailing." ***DiClaudio***, 210 A.3d at 1074. "This Court is "inclined to accept any reasonably verifiable evidence of the date that the prisoner deposits the [filing] with the prison authorities." ***Commonwealth v. Betts***, 240 A.3d 616, 619 (Pa.Super. 2020) (citation omitted). Our rules of appellate procedure provide that:

> [a] *pro se* filing submitted by a person incarcerated in a correctional facility is deemed filed as of the date of the prison postmark or the date the filing was delivered to the prison authorities for purposes of mailing as documented by a properly executed prisoner cash slip or other reasonably verifiable evidence.

Pa.R.A.P. 121(f). ***See Commonwealth v. Jones***, 700 A.2d 423, 426 (Pa. 1997) (citing envelope postage date as evidence that a notice of appeal was delivered to prison authorities within the filing deadline).

As the PCRA court denied Appellant's petition on June 23, 2022, Appellant was required to file a notice of appeal by Monday, July 25, 2022.

The envelope that Appellant used to mail his notice of appeal bears a U.S. Postal Service date stamp of "07/06/2022." The trial court docket entry for the notice of appeal includes a note stating, "Post marked 7/6/2022. Received in COC 8/9/2022." Thus, pursuant to the prisoner mailbox rule, we may find Appellant's notice of appeal was timely filed within the 30-day appeal period.

Before we reach the merits of Appellant's appeal, we also must determine whether this PCRA petition was timely filed. It is well-established that "the PCRA's timeliness requirements are jurisdictional in nature and must be strictly construed; courts may not address the merits of the issues raised in a petition if it is not timely filed." **Commonwealth v. Walters**, 135 A.3d 589, 591 (Pa.Super. 2016) (citations omitted). Generally, a PCRA petition "including a second or subsequent petition, shall be filed within one year of the date the judgment of sentence becomes final." 42 Pa.C.S.A. § 9545(b)(1). A judgment of sentence becomes final at the conclusion of direct review or the expiration of the time for seeking the review. 42 Pa.C.S.A. § 9545(b)(3).

However, Pennsylvania courts may consider an untimely PCRA petition if the petitioner explicitly pleads and proves one of the three exceptions enumerated in Section 9545(b)(1), which include: (1) the petitioner's inability to raise a claim as a result of governmental interference; (2) the discovery of previously unknown facts or evidence that would have supported a claim; or (3) a newly-recognized constitutional right that has been held to apply retroactively by the Supreme Court of the United States or the Supreme Court of Pennsylvania. 42 Pa.C.S.A. § 9545(b)(1)(i)-(iii).

In this case, this Court affirmed the judgment of sentence on October 26, 2011 and the Supreme Court denied Appellant's petition for allowance of appeal on October 24, 2012. Appellant did not seek discretionary review in the Supreme Court of the United States. Thus, Appellant's judgment of sentence became final on January 22, 2013, when the 90-day period for filing a petition for allowance of appeal in the U.S. Supreme Court expired. **See** U.S. Sup. Ct. R. 13. Thus, Appellant had until January 22, 2014 to file a timely PCRA petition. Thus, Appellant's third petition, filed on June 2, 2020, is facially untimely and Appellant must satisfy one of the PCRA timeliness exceptions to establish jurisdiction.

Appellant attempts to invoke two of the PCRA timeliness exceptions. First, Appellant argues that he is entitled to the application of the newly-discovered fact timeliness exception through the affidavits of four individuals who Appellant alleges could provide after-discovered exculpatory evidence.

In order "[t]o qualify for an exception to the PCRA's time limitations under subsection 9545(b)(1)(ii), a petitioner need only establish that the facts upon which the claim is based were unknown to him and could not have been ascertained by the exercise of due diligence." **Commonwealth v. Burton**, 158 A.3d 618, 629 (Pa. 2017). If the petitioner can establish both prongs, then the PCRA court may exercise jurisdiction over the matter. **Commonwealth v. Fears**, 250 A.3d 1180, 1199 (Pa. 2021).

It is important to distinguish the newly-discovered fact PCRA timeliness exception as set forth in Subsection 9545(b)(1)(ii) and a claim for relief based

on after-discovered evidence pursuant to 42 Pa.C.S.A. § 9542(a)(2). Once the PCRA court's jurisdiction has been properly invoked by a petition that was timely filed or satisfies one of the PCRA timeliness exceptions, a petitioner raising a claim of after-discovered evidence must prove that "(1) the exculpatory evidence has been discovered after trial and could not have been obtained at or prior to trial through reasonable diligence; (2) the evidence is not cumulative; (3) it is not being used solely to impeach credibility; and (4) it would likely compel a different verdict." **Burton**, 158 A.3d at 629 (quoting **Commonwealth v. D'Amato**, 856 A.2d 806, 823 (Pa. 2004)).

The PCRA court found that Appellant failed to establish that he acted within 60 days after discovering his claims or that he could not have discovered his alleged claims earlier through the exercise of due diligence. However, while Section 9545(b)(2) previously required petitioners to file a petition raising the applicability of one of the timeliness exceptions within sixty days from the date that the claim could have been raised, Section 9545(b)(2) has since been amended to give a petitioner one year rather than sixty days to raise his claim. 42 Pa.C.S.A. § 9545(b)(2) (as amended October 24, 2018, P.L. 894, No. 146). We note that this amendment became effective on December 24, 2018 and it applies only to claims arising on December 24, 2017, or thereafter. **Id**.

However, even assuming that these particular allegations in each of the four affidavits met the newly discovered evidence exception in that Appellant discovered this information within a year of filing this petition and acted with

due diligence in presenting this claim to the PCRA court, Appellant has not adequately pled how any of these allegations constitutes after-discovered evidence that entitles him to a new trial.[2]

The first two affidavits are interrelated. Appellant's first affidavit is from Odell Cannon, one of the individuals that the Commonwealth suspected had orchestrated Brown's murder. Appellant claimed that he did not have contact with Cannon until the two men met in prison in 2019 at which time Cannon gave Appellant a second affidavit that Randy Suber had prepared in 2017. In that second affidavit, Suber asserted that he neither had contact with Cannon before Brown's murder nor did Cannon direct him to locate Brown at the Elks Club that night.

We fail to see how Suber's allegation that he had no contact with Cannon before Brown's murder is likely to compel a different verdict in Appellant's case. While Suber's testimony is relevant to Cannon's defense, Suber does not provide any testimony that would constitute exculpatory evidence in favor of Appellant, who was accused of shooting and killing Brown.

The third individual, George Dalie, initially submitted an affidavit claiming that he was with one of the Commonwealth's eyewitnesses, Rahlik Gore, on March 31, 2006 participating in a drug transaction at a local Family Dollar store. Appellant subsequently submitted a revised affidavit (dated July

---

[2] The PCRA court also found that Appellant had failed to pled and prove that his counsel were ineffective in failing to present the four individuals as witnesses at trial. However, as Appellant has only framed these allegations in terms of after-discovered evidence, we must limit our analysis accordingly.

- 11 -

20, 2020) in which Dalie claimed he was actually with Gore on the night of April 1, 2006, as this was relevant date on which Brown was shot. Appellant claims that Dalie's testimony would show that Gore could not have witnessed Appellant shoot Brown if he was with Dalie when the shooting occurred.

To the extent that Dalie claimed that he was with Gore on March 31, 2006, the day before the murder, the PCRA court found such testimony irrelevant to Appellant's defense. Even in considering Dalie's corrected affidavit claiming he was with Gore on April 1, 2006, the PCRA court found that this affidavit still fails to contradict Gore's testimony that he had witnessed Appellant shoot the victim.

In the fourth affidavit (dated June 6, 2019), Steve Pugh claimed that a few weeks before Brown's murder, he took a picture with Appellant at a party in which Appellant was wearing a white sweatsuit and Nike Air Force One sneakers. Appellant suggests this would impeach Rahlik Gore's testimony that Appellant received a white sweatsuit and white Nike sneakers as payment for committing Brown's murder.

Appellant has not shown that this affidavit entitles him to relief as after-discovered evidence as it would solely be used to impeach Gore's credibility. Further, Appellant has not argued that Pugh's allegations could result in a different verdict in this case in light of the overwhelming evidence presented at trial. Appellant has neither challenged the testimony of Gore and Hamrick's testimony that they witnessed Appellant shoot the victim nor the testimony of Pinder and Legree who both claimed that Appellant told them he committed

the victim's murder. Accordingly, we conclude that the PCRA court did not err in denying Appellant relief on his claims of after-discovered evidence.

Second, Appellant alleges that he is entitled to the application of the governmental interference exception based on his specific allegation that the Commonwealth withheld exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Specifically, Appellant alleges that the Commonwealth failed to disclose to Appellant that Edgar Barber had testified before a grand jury in 2006 that Rahlik Gore and Robert Hamrick lied when they claimed to have hid on Barber's porch after Brian Keith Brown was shot. Appellant asserts that he only learned about Barber's account in 2019 when he was incarcerated with Cannon, who shared a transcript from his own evidentiary hearing in 2014 at which Barber gave similar testimony.

Our Supreme Court has provided that, in order to establish a *Brady* violation:

> a defendant must show that: (1) evidence was suppressed by the state, either willfully or inadvertently; (2) the evidence was favorable to the defendant, either because it was exculpatory or because it could have been used for impeachment; and (3) the evidence was material, in that its omission resulted in prejudice to the defendant. *See Commonwealth v. Lambert*, 584 Pa. 461, 471, 884 A.2d 848, 854 (2005); *Commonwealth v. Collins*, 585 Pa. 45, 68, 888 A.2d 564, 577–78 (2005). However, "the mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish materiality in the constitutional sense." *Commonwealth v. Chambers*, 570 Pa. 3, 29, 807 A.2d 872, 887 (2002) (citation omitted and emphasis added). Rather, evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is

a probability sufficient to undermine confidence in the outcome."
*Id*. at 29, 807 A.2d at 887–88.

***Commonwealth v. Willis***, 46 A.3d 648, 656 (Pa. 2012) (internal citation

omitted).

Our Supreme Court has recognized that:

[a]lthough a ***Brady*** violation may fall within the governmental interference exception, the petitioner must plead and prove the failure to previously raise the claim was the result of interference by government officials, and the information could not have been obtained earlier with the exercise of due diligence. [***Commonwealth v.***] ***Breakiron****,* [781 A.2d 94,] 98 [(Pa. 2001)]. Section 9545(b)(1)(ii)'s exception requires the facts upon which the ***Brady*** claim is predicated were not previously known to the petitioner and could not have been ascertained through due diligence. ***Commonwealth v. Lambert****,* 584 Pa. 461, 884 A.2d 848, 852 (2005). In [***Commonwealth v.***] ***Bennett****,* [930 A.2d 1264, 1270-72 (Pa. 2007)], we clarified that § 9[545](b)(1)(ii)'s exception does not contain the same requirements as a ***Brady*** claim, noting "we made clear the exception set forth in subsection (b)(1)(ii) does not require any merits analysis of the underlying claim. Rather, the exception merely requires that the 'facts upon which such a claim is predicated must not have been known to appellant, nor could they have been ascertained by due diligence." ***Bennett****,* at 1271 (quoting ***Lambert****,* at 852).

***Commonwealth v Abu-Jamal***, 941 A.2d 1263, 1268 (Pa. 2008).

We agree with the PCRA court that Appellant has not satisfied one of the

PCRA timeliness exceptions as he failed to show that he acted with due

diligence in presenting this claim. Appellant clearly knew that Barber was

present near the crime scene as witnesses testified at Appellant's trial in 2010

that Barber allowed them to hide on his porch after the victim's murder. He

makes no attempt to explain why he could not have discovered the substance

of Barber's account of the events in question until 2020.

Moreover, Appellant's claim fails on the merits as he has not established that Barber's testimony was "material" such that its omission resulted in prejudice to the defense. Barber's testimony merely concerned events that happened after Appellant was observed committing the victim's murder. Barber admitted that he had no knowledge of what occurred during the murder as he did not witness it. When viewed in context of the ample weight of the evidence of Appellant's guilt presented at trial, Appellant has not shown that there is a reasonable possibility that Barber's testimony, if it had been disclosed to the defense, would have changed the result of Appellant's trial. As such, Appellant is not entitled to relief.

Lastly, Appellant asserts that the PCRA court erred in refusing to address his challenge to the legality of his sentence. Specifically, Appellant claimed in his petition that his convictions for first-degree murder and conspiracy to commit murder should have merged for sentencing purposes.

It is well-established that "a court may entertain a challenge to the legality of the sentence so long as the court has jurisdiction to hear the claim. In the PCRA context, jurisdiction is tied to the filing of a timely PCRA petition." *Commonwealth v. Fowler*, 930 A.2d 586, 592 (Pa.Super. 2007) (internal quotations and citations omitted). Our Supreme Court has clarified that "[a]lthough legality of sentence is always subject to review within the PCRA, claims must still first satisfy the PCRA's time limits or one of the exceptions thereto." *Commonwealth v. Fahy*, 737 A.2d 214, 223 (Pa. 1999).

As Appellant's petition is untimely and he made no attempt to invoke one of the timeliness exceptions to allow for review of this specific argument, the PCRA court correctly refused to address the merits of the legality of sentencing claim as it was without jurisdiction to do so.

For the foregoing reasons, we affirm the order denying Appellant's third PCRA petition.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/12/2023